**CLAYWELL et al. v. INTER–SOUTHERN LIFE INS. CO. OF LOUISVILLE, KY.**

**No. 9771.**

Circuit Court of Appeals, Eighth Circuit.

April 6, 1934.

J. B. Daggett, C. E. Daggett, and Daggett & Daggett, all of Marianna, Ark., for appellants.

O. C. Brewer, George K. Cracraft, and Brewer & Cracraft, all of Helena, Ark., for appellee.

Before STONE and SANBORN, Circuit Judges, and WYMAN, District Judge.

STONE, Circuit Judge.

This is an action by a beneficiary upon two policies of life insurance. At the conclusion of the evidence for the plaintiffs, the court directed a verdict for the defendant. From the judgment entered thereon, plaintiffs bring this appeal. The main matter here is the sufficiency of the evidence, to go to the jury, upon the fact issue of whether the insured died within a certain period of time following his complete disappearance—which period is well within the five-year statutory presumption of death arising from continued absence.

The policies were issued December 23, 1920. Premiums were paid up to the point that the policies remained in force until June 25, 1927. The insured disappeared about August 10, 1926, and no information from or of him since. He was a resident of Arkansas and was last heard from in Florida. An Arkansas statute raises the presumption of death in the case of "any person absenting himself beyond the limits of this State for five years successively ʿ ʿ ʿ unless proof be made that he was alive within that time" (Crawford & Moses' Dig. Ark. § 4111). This action was commenced about six months after a period of five years from August 10, 1926. The necessary contention of appellants is that the insured died during the time the policies were in force, that is, between August 10, 1926 (when he was last heard from) and June 25, 1927 (when the policies lapsed). The burden lay upon appellants to introduce such proof of death between the above dates as would warrant submission of that issue to the jury. While an issue of limitations is stressed by both parties, we need give it no consideration since it is of no importance unless we conclude appellants have carried the above burden as to the main issue and this, we think, they have not done.

The main issue here is not the fact of death but the time of death. The statutory presumption is of the fact of death at some time within the five-year period of unexplained absence, it has no reference to the

date or time of death within the five years. Metropolitan Life Ins. Co. v. Fry, 184 Ark. 23, 41 S.W.(2d) 766. When a party desires to establish the approximate date of death within the statutory period, he assumes the usual and necessary burden of presenting evidence of a material fact—that fact being the time of death. In "disappearance" cases, it is obvious that there can be no direct evidence of death—otherwise, it would not be a "disappearance" case. The proof must be circumstantial in character. The main, if not the entire, strength of circumstantial evidence is that the "circumstances" shown point to but one logically probable conclusion. Obviously, the circumstances will vary with each case and it is clearly unsafe to generalize such into rules of judicial action. Courts have wisely refrained from doing so beyond a very limited extent in these recurring disappearance cases where the issue is time of death. We think these rules may be stated as two. The first and generally accepted one is that where the evidence shows exposure of the missing person to some specific, impending, or immediate peril or danger which might reasonably destroy life and he is not heard of thereafter and there is no evidence of a plausible reason for a voluntary disappearance, the issue is for a jury as to whether death was caused by such peril or danger. This is as far as the Supreme Court [Fidelity Mutual Life Ass'n v. Mettler, 185 U. S. 308, 22 S. Ct. 662, 46 L. Ed. 922; Davie v. Briggs, 97 U. S. 628, 24 L. Ed. 1086] or this court [Browne v. N. Y. Life Ins. Co., 57 F.(2d) 62; Folk v. United States, 233 F. 177, 189; Northwestern Mut. Life Ins. Co. v. Stevens, 71 F. 258] has yet gone. Appellants make no claim to come within the above situation (there being no evidence of any such peril or danger), but claim to fall within the rule announced by some courts to the effect that evidence of circumstances showing no reason for disappearance or self-destruction and every normal reason to the contrary would authorize submission of the issue as to death occurring at or shortly after disappearance. In our view of the evidence, it is unnecessary to determine whether this court will announce its adherence to such rule, since we think appellants have not brought themselves within it. We think it more useful and practical to adhere to the very good statement of Judge Gardner, for this court, in the Browne Case, supra, where he said (page 64 of 57 F.(2d)): "Death might be proven by circumstantial evidence, as any other fact, but the party alleging death before the expiration of seven years must prove such facts and circumstances connected with the absence of the person as, when submitted to the test of reason and experience, would warrant a reasonable conclusion of death within a shorter period."

Having in mind the shortly above-stated contention of appellants and the rule as stated by Judge Gardner, we examine the sufficiency of the evidence here. All of the evidence is from witnesses of appellants. There is no conflict in the testimony. It reveals a young man of industry and vigor, respected by his community. When about sixteen years old, he came from Kentucky to Arkansas. Within six years he found employment, near himself in Arkansas, for his father and younger brother. Two years later he is deputy sheriff of the county. About two years later he volunteered in the World War, where he saw over-sea service and returned a lieutenant. After the War, he became active in Legion and National Guard affairs, becoming captain of one of the first companies organized in the latter. Again he became deputy sheriff until appointed circuit clerk and ex officio county recorder. In 1922, he was elected to that office without opposition and held office until his disappearance, in August, 1926. He had announced his intention not to run for re-election in the election for 1926. He is described as of pleasing personality, affable disposition, highly respected and liked. He "enjoyed life," hunting and fishing much. He was about thirty-five years old at the time of disappearance. He was a dutiful son. He bought a house at the county seat where he brought his father and mother. Later, he bought and moved his parents onto a two hundred-acre farm. He was particularly attached and attentive to his mother and would always inform her if he was delayed in coming home. At the time insured left, there were no irregularities in his office, but a balance due him. Then he owned the farm and some personal property, including a tractor, several head of live stock, and farming equipment. There was a crop on the farm. The farm was mortgaged for $8,000. Also, he owed "about $4,400.00" to Payne Bros. and the bank had a lien on his personalty. He had two brothers and a sister, all married. There was a rumor that he had been named co-respondent in a divorce suit brought in St. Louis. Also, it was understood he was to be married, in the fall of 1926, to a young woman of the county where he lived. He had told a deputy in his office that when his term of office ended (apparently, a few months after he dis-

appeared), he intended "going off on a trip of business of two or three weeks as he had done several times before." Insured had "one offer to go into business for himself after expiration of his term of office. One of the biggest planters in Lee County had also offered him a position." In July, 1926, he left in his automobile. Insured talked with his deputy the day he left, saying he was "going away on a short trip" but did not state where or the nature of the trip. He told another friend that he would be back in time to vote for the friend's father at a primary election, early in August. He told his mother he was going on a fishing trip. A week or ten days later she received from him a letter mailed from Montgomery, Ala., on August 2d, and written on a letterhead of a Montgomery hotel, which was as follows:

"Sunday

"Dear Father and Mother—

"Well you will be very much surprised to get this from away over here I am going to be away longer than I thought when I left. I expect that I shall go down in Florida. Can't say when I will return. You both must not worry about me. I will take good care of myself.

"Will write every few days. If I go on to Florida shall try and get me all the fishing I want.

"Father anything in the way of money you need tell Bobbie to let you have. Will write again in a few days.

"Heaps of love—

"Teddy—."

This was the last word to her from him. His deputy had two letters and a telegram from insured. The first letter was received three or four days after he left and was mailed in a small town in Alabama. The other was from Jacksonville, Fla. (time not given). Both were of a "personal nature relating to affairs of the office." The telegram was from Jacksonville, Fla., and was sent on the Friday before the Tuesday of the primary election, which was the second Tuesday in August. The wire read: "Wire me fifty dollars I am leaving here Thursday." The money was sent the day after the primary and received by insured the day following that. No further word from or of insured has been received. The family corresponded with friends "all over the country" and also enlisted the services of the Legion and Veterans' Bureau in trying to locate insured.

The fatal deficiency in this evidence is that it leaves an uncertainty as to whether the disappearance was voluntary. The character of insured and his family relations with his mother argue that he would have returned or communicated with his mother if he could have done so. His involved financial affairs, the early termination of his office tenure, the evident uncertainty as to his future, and his conduct and statements concerning his trip argue the contrary—to which may be added the possibility of personal embarrassment from the delicate situation of his rumored marriage in the fall and his rumored involvement in the divorce suit. Although he talked to three persons concerning his trip, to only one, his mother, did he make any statement as to its purpose and to none (though one was his mother, the other his deputy, and the third an intimate friend) did he give any hint of where he was going. Both the letter to his mother and the wire to his deputy are noncommittal or indefinite as to his plans. The letter reveals either that he never intended going fishing (as he told his mother) or that he had changed his plans by the time he wrote her for he writes (italics ours): *"If I go to Florida* shall try and get me all the fishing I want." A few days later he is in Jacksonville wiring for money and intending to be there a week—until Thursday—when he is "leaving" there. His promise to return for the primary and his remaining in Jacksonville over the primary date, but wiring from there before the primary for money to leave there (not to return home), show his statement to his friend about returning for the primary was false or that he changed his mind afterwards.

*Undisputed* evidence which, taken as a whole, leaves one uncertain as to whether insured voluntarily disappeared or not lacks that degree of probability required either under the rule contended for by appellants or that above quoted from the Browne Case. Stevens v. The White City, 285 U. S. 195, 52 S. Ct. 347, 76 L. Ed. 699; Gunning v. Cooley, 281 U. S. 90, 94, 50 S. Ct. 231, 74 L. Ed. 720; N. Y. Central R. R. Co. v. Ambrose, 280 U. S. 486, 50 S. Ct. 198, 74 L. Ed. 562; Patton v. T. & P. Ry. Co., 179 U. S. 658, 663, 21 S. Ct. 275, 45 L. Ed. 361; Eggen v. United States, 58 F.(2d) 616 (C. C. A. 8); Ewing v. Goode (C. C.) 78 F. 442, 444, Taft, Circuit Judge. The classical case upon which appellants rely (Tisdale v. Conn. Mutual Life Ins. Co., 26 Iowa, 170, 96 Am. Dec. 136) in the summation of the evidence there submitted to the jury states not only the prosperous and happy state of the one disappearing, but also "with no cause of discontent with his condition, which would

have influenced him to break the domestic and social ties with which he was so pleasantly bound to life." Later that opinion states: "The reasons that the evidence above mentioned raises a presumption of death are obvious; absence from any other cause, being without motive and inconsistent with the very nature of the person, is improbable." The present case is more in the position of the Stevens Case, supra (71 F. 258), where Judge Sanborn held a charge based on the Tisdale Case not to be applicable.

Nor does this evidence satisfy the language of the Browne Case. It is uncertain. There is no way in which a determination as to time of death can be more than a guess on the part of the jury or any one else. It is somewhat analogous to the situation which sometimes arises in criminal cases when all of the evidence is as favorable to innocence as to guilt.

The judgment is affirmed.